214 A.2d 181.

DANIEL L. SULLIVAN *vs.* ANGELO A. MARCELLO,
*Director of Public Works.*

NOVEMBER 4, 1965.

PRESENT: Roberts, Paolino and Joslin, JJ.

JOSLIN, J. The complainant, the owner of a parcel of real estate fronting southerly on the George M. Cohan Memorial Boulevard, hereinafter referred to as the boulevard, brings this bill in equity against the respondent, the director of public works. He prays, insofar as here pertinent, either that the respondent be enjoined from taking the portion of the boulevard contiguous to his property and from obstructing his access to the north side and his use of the south side of the boulevard or, alternatively,

that just compensation be awarded. After hearing on bill, answer and proof before a justice of the superior court, a decree was entered denying the prayers for injunctive relief and awarding the complainant compensation in the amount of $68,028. From that decree both parties have appealed to this court, the complainant's appeal being limited to the purpose of protecting his claim to injunctive relief in the event of an adverse determination on the question of damages.

Acting pursuant to and following the procedures fixed by G. L. 1956, chap. 10 of title 24 and chap. 6 of title 37, respondent on or about January 28, 1964, filed in the office of the recorder of deeds of the city of Providence a description of certain real property and a plat thereof together with a statement setting forth that the property therein described was being condemned in fee simple for highway and freeway purposes. The boulevard, a municipal highway situated in the city of Providence, was included within the taking. It is divided by a median strip, runs in a generally easterly-westerly direction and is the most heavily traveled highway in the state. Vehicles traveling westerly on its northerly portion which is three lanes in width have a direct means of access to the gasoline service station situated on complainant's property. The operator of that station holds the property under a written lease which expires on June 30, 1969 and contains an option to renew or extend for an additional five-year term.

The condemnation was initiated in conjunction with the the state's planned construction of a freeway which upon completion will form a part of route 195 of the interstate highway system. As presently proposed, the southerly portion of the boulevard will be included within the freeway bounds and that part of its northerly portion abutting complainant's property and extending westerly therefrom to Brook street and easterly to East street, the distance between those streets being approximately 1,000 feet, will

be converted into a frontage or service road which will be available for two-way traffic. The portion of the freeway adjacent to the frontage road will be below its grade and between the two will be a retaining wall. Upon completion of the project, complainant's property, although it will still abut on and have access to such portion of the boulevard as will then be included within the frontage road, will not be accessible to the many thousands of vehicles which each day will use the new express lanes except by way of a circuitous route which the trial justice described as a "maze of streets" and reachable only "by virtue of most diligent search combined with a considerable degree of good fortune in taking the right turns and having resort to the right ramp." Concededly the enforced diversion of traffic from and inaccessibility to complainant's property will substantially lessen its market value.

The point originally briefed and argued by the parties is whether an enforced substitution of a right of access to a frontage road for an existing direct means of ingress and egress to and from heavily traveled through-traffic lanes constitutes a taking requiring compensation within the contemplation of the constitution.

The complainant goes to the issue tangentially and relying principally on *Johnston* v. *Old Colony R.R.*, 18 R. I. 642, *Gill* v. *Town Council*, 47 R. I. 425, *Newman* v. *Mayor of Newport*, 73 R. I. 385, and *Wolfe* v. *City of Providence*, 77 R. I. 192, contends in substance that his existing right of access is a property right entitling him to the use of the boulevard from end to end and from side to side, and that respondent cannot, without compensating him therefor, materially interfere with that right or take it from him.

While there is language in those decisions which seems to lend support to complainant's contentions, the contexts in which they came to the court were dissimilar from that in which this case comes to us. What we here consider is a taking for the purpose of constructing a high-speed, multi-

laned, limited-access freeway coupled with an imposed replacement of frontage road for main highway access. For that reason, if for no other, the side-to-side and end-to-end principles voiced in those decisions are inapposite unless, of course, the ultimate issues there decided can be related to the question now before us. That, however, is not the case because the court in those cases was passing on questions having no relevance to the issue here in dispute. Thus in *Johnston* v. *Old Colony R.R., supra,* we held that a real estate owner who purchased in reliance upon a duly-recorded plat showing a highway open to its full length was entitled to compensation when a railroad, acting under a statutory right, closed up one end of the street thereby creating a cul-de-sac; in *Gill* v. *Town Council, supra,* it was determined that an abutter was possessed of a special right to have the highway kept open to its full width, but the circumstances there were that the commissioners charged with marking out the boundaries of an existing highway reduced its width from sixty-six to sixty feet; and in *Newman* v. *Mayor of Newport, supra,* and *Wolfe* v. *City of Providence, supra,* the court insofar as it may have referred to those doctrines did not rely on them and was concerned in the former with the authority of the municipality to deny an abutter curb-cut permits for necessary approaches to a contemplated gasoline filling station, and in the latter with whether a municipality, acting pursuant to a statutory power to regulate traffic on certain public highways, was empowered to barricade the entrance to the abutter's property to such an extent as to make ingress and egress inconvenient if not impossible.

When those decisions are viewed as we have said they should be, the statement, "As abutters they are entitled to a special right to have the whole highway open," *Gill* v. *Town Council, supra,* at p. 431, while perhaps contextually apposite to the factual considerations then before the court, is not authoritative on the question of whether a

deprivation of or interference with access to a main arterial highway caused by a substitution of a similar right in a frontage road constitutes a taking.

Moreover, there is no merit in complainant's argument that his ownership of the underlying fee to the middle line of the boulevard gives to his right of access the significance for which he contends. In advancing that contention, he misconceives the nature of a right of access which is nothing more than an easement appurtenant to abutting land, *Wolfe* v. *City of Providence, supra,* at p. 201, Covey, "Frontage Roads: To Compensate Or Not To Compensate," 56 Nw. U.L. Rev. 587, 592, and exists irrespective of whether the fee to the highway to its middle line is in the abutter or the public. *Kelbro, Inc.* v. *Myrick,* 113 Vt. 64; *Lane* v. *San Diego Elec. Ry.,* 208 Cal. 29; *Kane* v. *New York Elevated R.R.,* 125 N. Y. 164; *Current* v. *Stevenson,* 173 Tenn. 250.

We conclude that neither complainant's right of access to the boulevard nor any title he may have to the underlying fee thereof to its middle line will support his contention that he is entitled to have it kept open from side to side and from end to end. If he is to be granted equitable relief or compensation, it must be for some other reason.

The respondent, in addition to countering complainant's contentions, places primary emphasis not on real property right of access concepts as did complainant, but rather on the frontage road problem which came to the fore coincident with the postwar large-scale construction of access-free interstate and local highway systems. He considers this a case of first impression in this state and argues that complainant does not have an eminent domain action notwithstanding the economic disadvantages which will be caused him by the proposed changes in the existing highway pattern. The complainant's damage, he says, is *damnum absque injuria* resulting from a legitimate regulation of traffic by the state under its police power and he con-

tends that complainant's resulting economic losses while greater in degree are in kind no different from those which will be sustained by other highway users. Any damage caused complainant because of the imposed substitutive access to the service road he equates with the noncompensable losses which follow the establishment of one-way streets and median strips, or the elimination of left and right turns, or the imposition of restrictions as to vehicle weight and speed, and he contends that complainant has no vested right to a continuation of the boulevard in its existing form. His theory in substance is that any diminution in the value of abutting property caused by its placement on the proposed frontage road is attributable solely to a diversion of traffic and the inconvenience resulting from traveling a circuitous route. Damages so caused he argues are noncompensable. He finds support for his position both in the texts and in what apparently is a majority of the decisions. *State Highway Comm'n* v. *Central Paving Co.*, 240 Ore. 71, 399 P.2d 1019; *Stefan Auto Body* v. *State Highway Comm'n*, 21 Wis.2d 363; *Darnall* v. *State*, 79 S.D. 59; *Arkansas State Highway Comm'n* v. *Bingham*, 231 Ark. 934; *Holbrook* v. *State*, Tex. Civ. App., 355 S.W.2d 235; Clarke, "The Limited-Access Highway," 27 Wash.L. Rev. 111; Covey, "Right Of Access And The Illinois Highway Program," 47 Ill. B.J. 634; Covey, "Frontage Roads: To Compensate Or Not To Compensate," 56 Nw. U.L.Rev. 587; Covey, "Highway Protection Through Control of Access and Roadside Development," 1959 Wis.L.Rev. 567.

While these precedents and authorities lend unqualified support to respondent's position, contrary results have been reached elsewhere. *State* v. *Thelberg*, 87 Ariz. 318; *People* v. *Ricciardi*, 23 Cal.2d 390; *McMoran* v. *State*, 55 Wash.2d 37; *Hedrick* v. *Graham*, 245 N. C. 249; *Franks* v. *State Highway Comm'n*, 182 Kan. 131. The rationale of these decisions is that among the bundle of property rights attaching to ownership of real estate is the benefit flowing

from the right of direct access to a highway in reliance upon which an abutter may have purchased his property; that the development of land will be discouraged if accessibility to transportation facilities can be impaired without obligation on the part of the condemnor to make the condemnee whole; and that an abutter's advantageous location to transportation facilities should be protected. Similar arguments were advanced by this court in another context in *Johnston* v. *Old Colony R.R.*, the railroad cul-de-sac case, *supra*, at p. 649. Basically, these decisions are predicated on the theory that "The right [of access] is more extensive than the mere opportunity to go on to the street immediately in front of the property. * * * To be able to get onto the street immediately in front of the property is of little value if that is as far as he [the abutting owner] can go." *Bacich* v. *Board of Control*, 23 Cal.2d. 343, 352, 354.

Some of the authorities distinguish between a rerouting of traffic from the highway and a relocation of the highway itself in relation to the property which originally abutted upon it. The former, they say, is noncompensable; the latter which destroys any access to through traffic, they hold, entitles an abutter to compensation. *People* v. *Ricciardi, supra; People* v. *Ayon*, 54 Cal.2d 217.

The diversity of opinion between the majority and the so-called California rule as to the compensability for a loss such as that sustained by complainant has been described as a joinder of issue between the police power and the power of eminent domain. So viewed, a determination of whether an enforced conversion to indirect access of what was theretofore direct access entitles an abutter to compensation depends on whether the police power or the right to compensation shall prevail. While we must in due course resolve the dilemma and elect as to which view we shall follow, because of the considerations to which we

now refer we feel that the time for that resolution has not yet arrived.

As we considered this case after original argument, questions suggested themselves which we deemed essential to the ultimate outcome but which had been neither briefed nor argued by the parties. In the light of the importance of this case to the general public as well as to the litigants, we hesitated at deciding those questions without first hearing further from counsel. Accordingly, the cause was peremptorily assigned for further argument and leave was granted for submission of authorities on the issues of whether respondent was committed to construct the frontage road as proposed or, alternatively, whether his statements in reference to the proposed location and construction were merely declaratory of future intentions. Both parties availed themselves of the opportunity afforded. Because our conclusion is that respondent is under no obligation to construct a frontage road or to preserve complainant's access thereto in the event of such construction, it becomes unnecessary to determine whether the constitution mandates that complainant be justly compensated for the enforced substitution, and this notwithstanding our extended consideration of the frontage road question, a consideration deemed advisable in this instance because of the emphasis given it by the parties in their original arguments. A question of such importance and on which, as we have already pointed out, the authorities are in conflict need not be resolved when only a bare quorum of the court is sitting and when the circumstances are such that an answer not being essential to a disposition of the cause would be no more than dicta.

We turn, therefore, to the considerations which lead to our conclusion that respondent's undertaking to provide complainant with access to a proposed frontage road cannot reasonably be construable other than as declarative of future intentions. That consideration leads to a discussion

of our condemnation procedures for in this state, and we differ from many others in this respect, a taking for highway or freeway purposes is not preceded by a judicial determination either as to the validity of its purpose or its ultimate use.

Insofar as here relevant the procedures fixed by the legislature for condemnation of land for highways and freeways are found in G. L. 1956, chap. 6 of title 37 and chap. 10 of title 24. Generally, they provide for an administrative rather than a judicial determination of the necessity for and the location of the proposed construction. It is the properties committee, a three-member administrative agency which, at the suggestion of the director of public works, authorizes the acquisition of such real property or estate or right therein as is necessary or advantageous for "establishing, laying out, widening, extending or relocating, regrading, straightening, or improving" any public highway. Once authorized the taking is completed and title is vested in the state by a filing in the appropriate office of the municipality where the property is located of a description and a plat of the property to be taken together with a statement of "the nature of the title to be acquired, whether the same be a fee simple or less than perpetual in duration * * *."

As to what must be done once the property is so acquired, the authority conferred by the legislature on the condemnor is latitudinous. More land may be condemned than is required for highway or freeway construction and the excess may be utilized pursuant to §37-7-4 for building sites, or for any public purpose, or sold or leased for value, and under §24-8-11 for the planting of trees and shrubs or other beautification. Moreover, although there is apparently no statutory prohibition against the acquiring authority committing himself in the condemnation instruments to construct a highway at a specified location or to preserve an abutter's right of access to a preexisting or

to-be-constructed service road, there is likewise no legislative directive obligating him to specify in those instruments which portions of the property condemned are to be utilized for road construction and which for other authorized uses, nor is he under legislative directive to include therein words in limitation or guarantee of existing or to-be-created rights of access.

Indeed, experience in a condemnation proceeding similar to that before us indicates that in practice at least it sometimes happens that land originally taken and contemplated at that time to be utilized for freeway construction is instead at some future time used for other permitted purposes. See *M. S. Alper & Son, Inc.* v. *Capaldi*, 99 R. I. 242, 206 A.2d 859.

With this background we turn to the condemnation instruments for it is within their four corners, and only there, that we can ascertain what was acquired and other than as provided by statute what, if any, limitations or restrictions on the use thereof were assumed. Those instruments disclose that respondent acting pursuant to and in conformity with the provisions of title 37, chap. 6, and title 24, chap. 10, acquired "the fee simple title to said land and other real property" as delineated and described in the description and on the plat. While each of those instruments states that the property is taken for highway and freeway purposes, and although on the plat there is delineated the location of the proposed construction, they contain no stipulation obligating the state to construct a frontage road, nor any provision limiting the state's statutory right to use for any of the permitted purposes land in excess of or in addition to that required for actual freeway construction. In those circumstances it must be held, irrespective of what view we ultimately follow on the naked frontage road problem, that complainant is entitled to compensation because the cases distinguishing between a reservation to an abutter to go upon the frontage road and

a declared intention to preserve an abutter's right hold uniformly that a mere intention to preserve a right of access is ineffective either to prevent compensation or to mitigate or to reduce damages. See annotation and cases cited 7 A.L.R.2d 364 et seq.

The respondent might have avoided payment of total compensation or at least reduced the amount thereof by stipulating in binding form in the instruments of condemnation that the frontage road would be constructed and maintained, that it would be connected to the arterial highway, and that complainant's right of access would be preserved. See 4 Nichols, Eminent Domain (3d ed.), §14.244, pp. 607-10. This was the procedure followed in *People ex rel. Dept. of Public Works v. Schultz Co.*, 123 Cal. App.2d 925, where the condemnation resolution conditioned the taking of the condemnee's access rights to an outer road connecting to the freeway by providing "that such remaining portion [of the condemnee's land] shall abut upon and have access to said outer highway which will be connected to the freeway * * *."

It is the method which Professor Netherton suggests as proper in his book "Control Of Highway Access" at p. 230 where he says:

"* * * Provision for frontage or service roads in the controlled-access original design may substantially reduce the damages assessed for impairment of access rights or for severance of the right-of-way land from the remaining area held by the landowner. To achieve this benefit, the instrument of condemnation must set forth the abutters' rights of access to the frontage or service road in definite terms. For example: 'The landowner, his heirs, assigns and successors in title shall have a right of access to the frontage or service road to be constructed or utilized as a part of this project from his remaining lands which abut upon such frontage or service road.' In all cases, of course, the instrument of condemnation should state, and maps of the highway project should make it clear, that

the 'access-control line' lies between the frontage or service road and the through-traffic portion of the highway."

The respondent does not dispute the absence from the condemnation instruments of a commitment to construct the frontage road and to preserve complainant's access to it nor does he assert the use therein of language the equivalent of that either used in *People ex rel. Dept. of Public Works* v. *Schultz Co., supra,* or advocated by Netherton. Instead, he urges in his brief, and it is the only argument he makes in this respect and it is made without any supporting authority, that the good faith and integrity of the director of public works, the state properties committee, and the federal bureau of public roads, a contributing participant to the financing of the planned project to the extent of 90 per cent of the acquisition and construction costs, compel the conclusion that there "is a genuine commitment that this project, as thus proposed, will be consummated." We do not question the good faith or the intentions of these public officials, but in condemnation proceedings where rights in property have been taken, compensation, if it is to be just, must be for the full extent of those rights and cannot be limited to an indemnification of the condemnee only for such of those rights as are intended in good faith to be utilized. *Vallone* v. *City of Cranston,* 97 R. I. 248, 197 A.2d 310. And the extent of what has been taken is determined as of the day of the taking. *M. S. Alper & Son, Inc.* v. *Director of Public Works,* 98 R. I. 154, 200 A.2d 583; *L'Etoile* v. *Director of Public Works,* 89 R. I. 394. Where, as here, the condemnation instruments in no way inhibited the condemnor from a complete destruction of complainant's right of ingress and egress between the boulevard and his property, the mandate of just compensation requires payment as if the right of access were to be obliterated. *Newman* v. *Mayor of Newport,* 73 R. I. 385; *Allen & Reed, Inc.* v. *Presbrey,* 50 R. I. 53.

In short, in cases like this if compensation is to be just it must be measured by what the condemnor can do and not by what he intends to do, it being the rule that the damages are to be assessed on the most injurious method of construction that is reasonably possible. *North Carolina State Highway etc. Comm'n* v. *Black,* 239 N. C. 198; 2 Lewis, Eminent Domain (3d ed.), §713, pp. 1249-50. If as of the time of condemnation the condemnor has the power, even though not the intention, to destroy a right of access, the condemnee's damages are to be determined as if the right were destroyed. To give a condemnee less would be to deny him the right guaranteed to him by the constitution.

Finally we come to the question of damages. The parties are in accord that the jurisdiction of equity having once attached, it was within the province of the trial justice to award compensation. See *Stone* v. *Peckham,* 12 R. I. 27, 31. The respondent, however, while urging as one of his reasons of appeal that the compensation award was grossly excessive, fails to point out in what particulars the finding of the trial justice as to the before and after market values of complainant's property was clearly wrong or how it failed to do justice between the parties. This we have said many times is the burden put on one seeking to disturb the findings of fact made by a trial justice sitting in equity. *Sterns* v. *Industrial National Bank,* 96 R. I. 313, 191 A.2d 152; *Castle Construction Co.* v. *Ferreira,* 99 R. I. 703, 210 A.2d 605; *City of Warwick* v. *Del Bonis Sand & Gravel Co.,* 99 R. I. 537, 209 A.2d 227.

For us to discuss in detail at this juncture the testimony on damages would add unduly to an opinion already extended in length beyond normal limits. It is sufficient to observe that the trial justice in his decision painstakingly reviewed in detail and commented with clarity upon the testimony of the real estate experts who testified on the question of damages. Those experts gave varying opinions

as to the value elements leading to their individual conclusions of the fair market value of the condemned property, conclusions which in each instance were premised primarily on a capitalization of rental income approach. In considering and discussing those opinions and in the course of the acceptance and rejection process, he pointedly indicated the testimony upon which he relied for his ultimate determination of what compensation he deemed just. We accord great weight to his findings of fact and in the absence of any contention that his finding as to the amount of the award was premised upon an application of an erroneous rule of law or was either clearly wrong or based upon a disregard or misconception of the evidence, it must be accepted as conclusive. *John Hancock Mutual Life Ins. Co.* v. *Dietlin,* 97 R. I. 515, 199 A.2d 311.

The complainant's appeal is denied and dismissed pro forma, the respondent's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Roberts & McMahon, William F. McMahon,* for complainant.

*J. Joseph Nugent,* Attorney General, *Joseph L. Breen,* Chief Special Counsel, for respondent.