258 A.2d 73.

NATHAN M. HONIG *et ux. vs.* DIRECTOR OF PUBLIC WORKS FOR THE STATE OF RHODE ISLAND.

OCTOBER 28, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

PAOLINO, J. This petition for assessment of damages by a jury was brought under the provisions of G. L. 1956, chapter 6 of title 37, as amended. The case was heard before a justice of the superior court sitting without a jury, the plaintiffs having by stipulation waived their right to a trial by jury. At the close of the plaintiffs' case, the state rested without presenting any evidence. After the hearing, the trial justice rendered a decision in favor of the plaintiffs on the basis of which a judgment was entered awarding the plaintiffs damages in the sum of $12,700 plus interest from the date of condemnation. The case is before us on the state's appeal from such judgment. We affirm. *Murphy* v. *Director of Public Works,* 103 R. I. 451, 238 A.2d 621.

The narrow issue raised by this appeal is whether the taking of the front portion of their property deprived plaintiffs of all access thereto at the time of the condemnation. The answer depends upon whether the condemnation was for freeway purposes or for state highway purposes.

## The Condemnation

Pursuant to the procedures prescribed by G. L. 1956, chapter 10 of title 24, and chapter 6 of title 37, the state filed in the office of the recorder of deeds of the city of Cranston a description of certain real property and a plat thereof together with a statement setting forth that the property therein described was being condemned in fee simple for highway and freeway purposes. The statement of the taking alleges that the property being condemned is shown upon a plat entitled "Rhode Island Department of Public Works, Division of Roads and Bridges, Freeway No. 18, Cranston, Huntington Expressway Ext. from Reservoir Avenue to Interstate Route 95, 2 Sheets, Sheet No. 2, Plat No. 1307," which plat is duly recorded in the land records of the city of Cranston. The condemnation was initiated for the purpose of extending the Huntington Expressway to route 95 of the interstate highway system.

A certified copy of the original condemnation map is in evidence as plaintiffs' exhibit No. 1 and a certified copy of the document containing the description and statement of taking is in evidence as plaintiffs' exhibit No. 2. For convenience we shall hereinafter sometimes refer to exhibit No. 1 as "Plat No. 1307" and to exhibit No. 2 as "the description and statement of taking."

## Plaintiffs' Real Estate

The plaintiffs owned property at 2 Beacon Circle in the city of Cranston, consisting of a lot of land 6,561.45 square feet in area, together with buildings and improvements thereon, including a house and attached garage. The prop-

erty fronted only on Beacon Circle. The state condemned only the front portion of plaintiffs' land. The part taken was triangular in shape, was 963 square feet in area, fronted along Beacon Circle, and ran the entire width of plaintiffs' property along Beacon Circle. The only means of ingress to and egress from plaintiffs' property by paved road would be by way of Beacon Circle. This the defendant admits in its brief. The portion taken is designated as parcel numbered 37 on plat No. 1307.

### The Hearing in the Superior Court

The plaintiffs are seeking damages for the value of the land taken and, in addition, severance damages to their remaining land. They base their entitlement to the latter principally upon their claim that the taking of the front portion of their land deprived them of all access to their property.

The only witnesses who testified were Nathan M. Honig, one of the plaintiffs, and Ralph A. Pari, plaintiffs' real estate expert.

Mr. Honig testified that he had received a letter dated August 9, 1963, from the department of public works notifying him that the state had condemned property belonging to him for freeway purposes. The letter was admitted in evidence, over the state's objection, and marked as plaintiffs' exhibit No. 4.

Mr. Pari testified that in his opinion, based upon comparable sales in and around the general area, the value of plaintiffs' property immediately before the taking was $16,900 and that, if plaintiffs' land became landlocked as a result of the taking, the loss of value to their property would be approximately 75 per cent, or $12,700.

During Mr. Pari's direct testimony, the parties stipulated that, if the right of access had not been destroyed by the taking, the severance damages to plaintiffs' property would

amount to $5,350. Mr. Pari stated that in his opinion this would be a fair and reasonable adjustment. The state presented no witness to contradict Mr. Pari's testimony; neither did the state impeach his testimony during cross-examination.

It is undisputed that the written description and statement of taking describing by metes and bounds the area condemned, does not differentiate between a freeway line and a state highway line. That document describes only the outmost boundary line of the whole condemnation area within plat No. 1307 and states that the taking is for freeway and highway purposes. This is conceded by the state. It appears that plat No. 1307 follows the same metes and bounds description as contained in the description and statement of taking, but contains notations attempting to differentiate freeway lines from state highway lines.

The plaintiffs offered in evidence as plaintiffs' exhibit 3 a copy of a plan prepared by the state department of public works showing the proposed construction of a cul-de-sac. It appears from the transcript that, since the condemnation, a cul-de-sac had been constructed as a continuation of Beacon Circle past plaintiffs' property. However, it was conceded by the state that there was no evidence that any such plan was in contemplation at the time of the condemnation. The trial justice noted that the state was under no obligation to construct the cul-de-sac at the date of condemnation.

The plaintiffs argued in the superior court that the rights of the state must be found within the four corners of the description and statement of taking and that so viewed their property was completely landlocked. The plaintiffs pointed out that what the state had done was to draw a line directly across the front of plaintiffs' property; that this line was so located that plaintiffs could not get out of their property to the north or to the west without crossing state

property; and that they could only get out to the east and the south by going across property of others. The trial justice accepted plaintiffs' argument and stated that as of the time of condemnation plaintiffs were deprived of any access to a public highway. He pointed out that they were bound on two sides by state property with no right of access and on the other two sides by private property. In the circumstances he held that the case at bar was controlled by our decision in *Murphy, supra.* Counsel for the state conceded that the foregoing facts were correct and, in reply to a question by the trial justice, he agreed that this case fell within the *Murphy* case. Accordingly, the trial justice allowed plaintiffs to present expert testimony as to the value of their property on the assumption that it lacked access to any public highway.

In his decision the trial justice made the following pertinent observations. He was faced with the fact that the taking was described in a written instrument and statement of condemnation as being for freeway and highway purposes and by a map pursuant to the provisions of G. L. 1956, §37-6-14. The written description by metes and bounds contained no distinction whatever between any lines as being for freeway purposes or highway purposes. There are designations on the map of a possible distinction between a freeway line and a state highway line; an arrow indicates that the line, which runs across the front of plaintiffs' property as it continues northerly and crosses Beacon Circle, is a state highway line; another arrow indicates that the line which is closer to the edge of the freeway is a freeway line.

He stated that as a matter of law, if this condemnation were for highway purposes only, plaintiffs would lose no access to a public highway, but that if the line of taking across plaintiffs' property was a freeway line, they would lose all right of access to the highway beyond it, would be-

come landbound, and would have no means of access to their property from a public highway. He pointed out that there was a difference in the measure of damages, depending upon whether the taking was for freeway purposes or for state highway purposes. He also stated that, if the access was completely lost, the case at bar would be governed by our recent decision in *Murphy, supra,* which, he noted, followed clearly from our decision in *Sullivan* v. *Marcello,* 100 R. I. 241, 214 A.2d 181.

The trial justice recognized that §37-6-14 required the filing of both the map and the document containing the description and statement of taking. He ruled that condemnation instruments must be construed strictly against the state. With regard to the question of whether the map in combination with the description and statement of taking had brought about a freeway line adjoining plaintiffs' property, or a highway line, thus enabling them to have access, he held that at best there was doubt and that, therefore, the instruments should be construed against the state. On the record before him he found that the line bordering on plaintiffs' property was a freeway line; that plaintiffs were deprived of all access to a public highway; and that they had suffered damages in the amount of $12,700 plus interest.

The trial justice suggested that the judgment also contain a finding by him that, if this was a highway line and there was no loss of access, the damages suffered by plaintiffs would be $5,350 plus interest. His reason for so doing was to expedite the disposition of the case if there was an appeal to this court. A judgment based on his findings and decision was duly entered.

I

We agree with the state's observation that, as used in condemnation documents, freeway lines have a different interpretation than highway lines. A freeway, a state high-

way, and a local highway have the following statutory definitions:

"A freeway is a way especially designed for through traffic over which abutters have no easement or right of light, air or access by reason of the fact that their property abuts upon such way." G. L. 1956, §24-10-1

"State highway. Every street or highway constructed and maintained, or maintained by the director of public works and the division of roads and bridges." G. L. 1956, §31-1-23 (h)

"Local highway. Every street or highway other than a state highway or private road or driveway." G. L. 1956, §31-1-23 (i)

It is apparent, as the parties point out, that according to the statutory definition, abutters to a freeway line have no right whatsoever to interfere with the freeway line by virtue of abutters' rights. There are no cases squarely in point establishing the rights of abutters on state highways. However, since the definition of a freeway specifically states that abutters have "no easement or right of * * * access" by reason of being abutters "upon such way," and since similar prohibitions are not contained in the definitions of state and local highways, it is reasonable to assume that the legislature recognized the generally accepted view that the right of access to and from a public highway or street is a natural easement and one of the incidents of the ownership or occupancy of land abutting thereon and that it exists whether the fee to the highway is in public or in private ownership. Therefore, it would seem to be established that abutters on state highways have a right of access to such highway. See 39 Am. Jur. 2d, *Highway, Streets, and Bridges* §178. See also *Wolfe* v. *City of Providence,* 77 R. I. 192, 205, 74 A.2d 843, 850. Compare *Greene* v. *State Board of Public Roads,* 50 R. I. 489, 149 A.596; *Allaire* v. *City of Woonsocket,* 25 R. I. 414, 56 A. 262.

## II

We consider now the state's contention that there is a distinction drawn between the freeway line and the highway line on the condemnation documents involving plaintiffs' property. Before considering this argument, it may be well to refer to the pertinent statute. Section 37-6-14 reads as follows:

> "Filing of condemnation papers—Vesting of title.— Within six (6) months after the state properties committee has authorized condemnation proceedings, the acquiring authority shall file in the office of the recorder of deeds or town clerk in the city or town where the land or other real property to be acquired is situated, a description of such land or other real property and also a plat thereof and a statement that such land or other real property is taken pursuant to the provisions of this chapter, and the nature of the title to be acquired, whether the same be a fee simple or less than perpetual in duration or subject to any easements or rights-of-way or subject to any reserved or outstanding interests or rights, or subject to any encumbrances, which description, plat and statement shall be signed by the head of the acquiring authority, and upon the filing of such description, plat and statement the title of such land or other real property as set forth in such statement shall vest in the state of Rhode Island and all funds at any time in the state treasury not otherwise appropriated shall thereupon be available for the payment of the value of the land or other real property so taken and of appurtenant damage to any remainder with lawful interest thereon."

Section 24-10-2 provides that the director of public works shall have the same authority and power over freeways as he now possesses relative to highways, including the authority and power to acquire or accept title to the lands or rights-of-way needed for the same.

It is clear from a reading of §§37-6-14 and 24-10-2 that the statutes authorizing condemnation of land for highway

and freeway purposes require the acquiring authority to file within the time provided the following documents: (a) a description of the land or other real estate taken, (b) a plat thereof, and (c) a statement of authorization of taking.

The document containing a description of the land being taken is headed "Description of land taken in fee simple for State Highway purposes and in fee simple for Freeway purposes." It then goes on to describe the land being taken by metes and bounds, describing only the outermost boundary line of the whole condemnation area within plat No. 1307. As we have previously stated, the state concedes that the written description does not differentiate between a freeway line and a state highway line, but it argues that, although the above is true, the plat map clearly follows the same metes and bounds set out in the written description, but differentiates the boundary lines that are freeway boundary lines from state highway lines by certain markings and notations. It points to the fact that on the map the take line through plaintiffs' property is designated as a state highway line. It also refers to plaintiffs' exhibit No. 3, which shows Beacon Circle remaining in existence up to the new state highway line in the same condition that it was in prior to condemnation and which also shows that the portion that became a state highway was continued to a cul-de-sac to provide turn-around room.

The state argues that these documents, the plat map and the description, must be read together for a valid taking. It contends that, when so read, the documents show that the line in front of plaintiffs' remaining property fronting on Beacon Circle is a highway line, that they evidence an intent to preserve plaintiffs' right to the road by virtue of putting a state highway line across their property rather than a freeway line, and that the condemnation documents therefore protect plaintiffs' rights of ingress and egress and thus avoid a landlocking situation to their property. The

state further argues that the taking in the case at bar is distinguishable from that in *Murphy* and *Sullivan,* both *supra,* because there is no evidence in this case to show a taking by the state of plaintiffs' easement to the road.

We find no merit in any of the arguments made by the state. On this record we find no error in the trial justice's finding that the line bordering plaintiffs' property was a freeway line and that, therefore, they had suffered a loss of all access as a result of the taking. The weakness in the state's position is its assumption that the designations on the map are binding on defendant. As the court said in *Sullivan, supra,* at 251-252, 214 A.2d at 186-187:

> "While each of those instruments states that the property is taken for highway and freeway purposes, and although on the plat there is delineated the location of the proposed construction, they contain no stipulation obligating the state to construct a frontage road, nor any provision limiting the state's statutory right to use for any of the permitted purposes land in excess of or in addition to that required for actual freeway construction. In those circumstances it must be held, irrespective of what view we ultimately follow on the naked frontage road problem, that complainant is entitled to compensation because the cases distinguishing between a reservation to an abutter to go upon the frontage road and a declared intention to preserve an abutter's right hold uniformly that a mere intention to preserve a right of access is ineffective either to prevent compensation or to mitigate or to reduce damages. See annotation and cases cited 7 A.L.R.2d 364 et seq.
>
> "The respondent might have avoided payment of total compensation or at least reduced the amount thereof by stipulating in binding form in the instruments of condemnation that the frontage road would be constructed and maintained, that it would be connected to the arterial highway, and that complainant's right of access would be preserved. See 4 Nichols, Eminent Domain (3d ed.), §14.244, pp. 607-10. This was the procedure followed in *People ex rel. Dept. of Pub-*

*lic Works* v. *Schultz Co.*, 123 Cal. App.2d 925, where the condemnation resolution conditioned the taking of the condemnee's access rights to an outer road connecting to the freeway by providing 'that such remaining portion [of the condemnee's land] shall abut upon and have access to said outer highway which will be connected to the freeway * * *.' "

It follows from what the court said in *Sullivan*, that, although the description and the plat must both be filed, what appears on the plat as indicative of intention on the part of the state is not binding upon it unless the written description contains a "stipulation obligating the state" or "limiting the state's statutory right to use" the land so taken. Again, as the court said in *Sullivan*:

"* * * it is within their four corners, and only there, that we can ascertain what was acquired and other than as provided by statute what, if any, limitations or restrictions on the use thereof were assumed." *Id.* at 251, 214 A.2d at 186.

In the case at bar the state could have stipulated in binding form in the documents of condemnation that the culde-sac would be built in front of plaintiffs' property, that it would be maintained, that it would be connected to the portion of Beacon Circle not included in the taking, and that plaintiffs' right of access to the same would be preserved. The good faith of the state and what it intended to do are not material unless such intention is set forth in binding terms in the condemnation documents. The extent of the taking is determined as of the date of taking. This aspect of the problem before us was also considered by the court in *Sullivan* and answered as follows:

"In short, in cases like this if compensation is to be just it must be measured by what the condemnor can do and not by what he intends to do, it being the rule that the damages are to be assessed on the most injurious method of construction that is reasonably possible. (cites omitted) If as of the time of condemnation the

condemnor has the power, even though not the intention, to destroy a right of access, the condemnee's damages are to be determined as if the right were destroyed. To give a condemnee less would be to deny him the right guaranteed to him by the constitution." *Id.* at 254, 214 A.2d at 188.

## III

Under point III in its brief the state makes a further argument to buttress its contention that the condemnation documents, when read together, distinguish the freeway line from the highway line in the condemnation involving plaintiffs' property. It contends that the condemnation documents preserve plaintiffs' abutters' rights by virtue of incorporating a state highway line in front of plaintiffs' property fronting on Beacon Circle. In view of our conclusion that the trial justice did not err in finding that the line bordering plaintiffs' property was a freeway line, this argument requires no further discussion.

## IV

The state's final argument is that plaintiffs' abutters' rights were maintained by virtue of the state putting in a cul-de-sac in Beacon Circle. As we have previously indicated, after the condemnation the state built a cul-de-sac at the end of Beacon Circle and continued Beacon Circle to the cul-de-sac. The defendant argues that this in effect continued plaintiffs' easement to the road and, once the road is in, all rights are fully preserved and can only be changed by grant or condemnation; that this easement was fully perfected at the time of trial and as such creates the natural easement to the public highway attributable to an abutting owner even if the condemnation documents had destroyed his easement to the road; and that in the circumstances plaintiffs have not lost access or the other natural easements that run with property abutting state highways.

This argument is also lacking in merit. The extent of

the taking and of plaintiffs' rights to damages resulting therefrom must be determined as of the time of taking. *Sullivan, id.* at 253, 214 A.2d at 188. As of the date of the taking, the state was under no legal obligation to construct the cul-de-sac. Indeed, it could have used all of the land taken for freeway purposes and it could have erected a barrier blocking the entire frontage of plaintiffs' remaining property. In these circumstances, the subsequent erection of the cul-de-sac cannot affect plaintiffs' right to recover damages as of the date of the taking. Nor does plaintiffs' use, in common with all others, of the cul-de-sac affect plaintiffs' right to recovery. See *Murphy, supra,* 103 R. I. at 460-61, 238 A.2d at 626. As of the date of the taking, their legal right of access had been taken by the state and, therefore, they had no right whatever to any easement as of that date.

On this record the plaintiffs are entitled to an award for full damages for the loss of all access to their property. The plaintiffs' real estate expert testified that, based on comparable sales, the value of their property immediately prior to the time of condemnation on May 14, 1963 was $16,900. In reply to a hypothetical question as to the loss of value to the plaintiffs' property if it were assumed that the taking deprived the property of all access, he stated that in his opinion the property would be damaged approximately 75 per cent, or $12,700. The state presented no contradictory evidence, expert or otherwise. In fact, as we understand its brief, the state is not attacking the amount of the award if we sustain the trial justice's finding that the plaintiffs' property was deprived of all access by the taking. We affirm such finding and conclude that the award of damages in the amount of $12,700 plus interest is supported by the evidence.

The state's appeal is denied and dismissed, and the judgment appealed from is affirmed.

*Monti & Monti, Francis A. Monti,* for plaintiffs.

*Joel D. Landry,* Assistant Counsel, Office of Special Counsel—State of Rhode Island.